UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
DSI ASSIGNMENTS, LLC, as assignee for the )
benefit of creditors of Pearl Automation, Inc., )
                                    )
        Plaintiff,                  )       Civil Action No.
                                    )       17-11963-FDS
        v.                          )
                                    )
AMERICAN ROAD PRODUCTS, INC.,       )
INSTALLERNET, INC., and ANTHONY     )
FRANGIOSA,                          )
                                    )
        Defendants.                 )
_____ )

## MEMORANDUM AND ORDER ON PLAINTIFF'S
## MOTION TO DISMISS COUNTERCLAIMS

**SAYLOR, J.**

This cases arises out of the alleged breach of a purchase order contract. Plaintiff DSI Assignments, LLC, is the assignee of the creditors of Pearl Automation, Inc. As assignee, DSI Assignments owns all of Pearl's assets and intellectual property. Among those assets were patents related to Pearl's automotive rearview camera and alert system, known collectively as "RearVision," and various trademarks known as the "PEARL Marks."

In the spring of 2017, Pearl was engaged in negotiations with defendants American Road Products, Inc. ("ARP"), InstallerNet, Inc., and Anthony Frangiosa, ARP's President, for the purchase of all RearVision inventory. Pearl and ARP signed a purchase order on June 23, 2017. That same day, Pearl discontinued its operations, and executed a general assignment of its assets in favor of DSI Assignments.

However, various disputes arose concerning the performance of the purchase order,

culminating in this litigation.  In the amended complaint, DSI Assignments alleges that defendants failed to pay for Pearl's inventory and that they infringed on Pearl's trademarks. Defendants have filed a counterclaim, alleging that Pearl breached the purchase order contract by failing to provide the complete source code for RearVision.

DSI Assignments has moved to dismiss the counterclaim for failure to state a claim.  For the following reasons, the motion will be denied.

**I.    Background**

    **A.    Factual Background**

The facts are set forth as described in the counterclaim and certain documents provided by the parties, to the extent they were "sufficiently referred to in the [counterclaim]."  *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).[1]

American Road Products, Inc., is a Massachusetts-based manufacturer and distributor of automotive aftermarket products.  (Counterclaim ¶ 6).  It manufactures, and owns patents relating to, backup-camera license-plate products.  (*Id.*).  Installernet, Inc. is alleged to be the alter ego of ARP.  (Am. Compl. ¶ 11(c)).[2]

Pearl Automation, Inc., was a Delaware corporation with a principal place of business in California.  (Counterclaim ¶ 7).  It ceased active operations in June 2017.  (*Id.*).  Prior to June 2017, Pearl developed, marketed, and manufactured "RearVision," a solar-powered aftermarket automotive backup camera and alert system.  (*Id.* ¶ 8).  Drivers whose cars lack pre-installed backup cameras can attach RearVision to their rear license plate and view the camera through a

---

[1] On a motion to dismiss, a court may properly take into account certain types of documents outside the counterclaim without converting the motion into one for summary judgment:  (1) documents of undisputed authenticity; (2) documents that are official public records; (3) documents that are central to the claims; and (4) documents that are sufficiently referred to in the counterclaim.  *See Watterson*, 987 F.2d at 3.

[2] The amended complaint alleges that Installernet and ARP President Frangiosa "exercise[ed] complete control and dominance" over ARP such that they are all legally indistinguishable entities.  (Am. Compl. ¶ 11(d)).

2

smartphone mounted on the dashboard. (*Id.*).

RearVision has four main components: (1) a license plate frame with built-in video cameras; (2) an onboard diagnostic port "dongle"; (3) a magnetic phone mount; and (4) a software application. (*Id.* ¶ 9). The dongle is a hardware component that plugs into the car's onboard diagnostic port, connecting the camera to a smartphone. (*Id.*). The magnetic phone mount secures the smartphone on the dashboard. (*Id.*). The software application is necessary for the smartphone to interface with the video camera. (*Id.*).

By spring 2017, Pearl faced significant financial problems. (*Id.* ¶ 10). Therefore, it sought to sell its remaining RearVision inventory to ARP. (*Id.*). The individuals negotiating the purchase were Anthony Frangiosa, ARP's President; Karen Carte, Pearl's Vice President of Finance; and Brian Sander, Pearl's co-founder and Chief Operating Officer. (*Id.* ¶ 11).

During negotiations, the parties discussed ARP taking over Pearl's support and maintenance responsibilities for RearVision, including Pearl's website. (*Id.* ¶ 10). Pearl agreed to update RearVision's software so that it could function without Pearl's future involvement. (*Id.* ¶ 11). In addition, Pearl agreed to provide the RearVision source code so that ARP could continue to support the RearVision inventory. (*Id.* ¶ 12).

In early June 2017, ARP started servicing RearVision products and assumed responsibility for processing any returns. (*Id.* ¶ 13). By mid-June, Frangiosa and Carte were close to finalizing the purchase agreement. (*Id.* ¶ 14). However, Carte stated that she would need approval from COO Sander and Comerica Bank, one of Pearl's creditors. (*Id.*).

On June 23, 2017, ARP and Pearl signed a purchase order. (*Id.* ¶ 15). Under the contract's terms, ARP agreed to buy Pearl's RearVision inventory, including both new and returned goods, for $323,420. (Counterclaim Ex. A). In addition, Pearl granted ARP access to

"all necessary operations and technology required to support the sales, maintenance[,] and service of [Rearvision]," along with RearVision's source code. (*Id.*). Pearl further granted ARP a royalty-free, worldwide license for all of Pearl's "intellectual property necessary to sell, support[,] and maintain [RearVision]." Finally, the purchase order also gave ARP a "right of first refusal . . . to match any legitimate offer to purchase some or all of assets related to [RearVision]." (*Id.*).

However, on the date the purchase order was executed, the RearVision inventory was in the possession of one of Pearl's creditors, Ingram Micro Mobility. (Counterclaim ¶ 17). Ingram had asserted a lien on that inventory. (*Id.*). Also on that date, Pearl executed a general assignment, transferring ownership of all its assets to DSI Assignments. (Pl. Ex. B). The assignment was accepted by DSI Assignments on July 7, 2017. (*Id.*).

The assignment stated that DSI Assignments "shall have all powers necessary to marshal and liquidate the estate including but not limited to . . . [the power to] collect any and all accounts receivable and obligations owing to [Pearl]" and "[the power to] settle any and all claims against or in favor of Assignor, with the full power to compromise, or, in the Assignee's sole discretion, to sue or be sued, and to prosecute or defend any claim or claims of any nature whatsoever existing in favor of assignor." (*Id.* ¶¶ 5(a), 5(f)). The assignment further provided that "neither the Assignee nor any of its employees, officers, agents or representatives will assume any personal liability or responsibility for any of its acts as Assignee herein, but its obligation shall be limited to the performance of the terms and conditions of the general assignment in good faith and in the exercise of its best business judgment." (*Id.* ¶ 7). Finally, as relevant here, the assignment stated that "the Assignee shall succeed to all of the rights and privileges of the Assignor . . . in respect to any potential or actual claims, cases, controversies, or

causes of action and shall be deemed to be a representative of the Assignor with respect to all such potential or actual claims, cases, controversies, or causes of action." (*Id.* ¶ 9).

On June 30, 2017, American Road Products wired $70,974.87 to Ingram to secure the RearVision inventory. (Counterclaim ¶ 17). Around that date, Pearl delivered some, but not all, of the source code necessary for RearVision's continued operation. (*Id.* ¶ 18).

On July 5, 2017, a Pearl employee, Tyler Mincey, sent an e-mail to ARP requesting additional time to "bundle the Car Adapter Firmware and the Android app." (*Id.* ¶ 18). Neither Pearl nor DSI has delivered the remaining source code since that date. (*Id.* ¶ 20). Without the complete source code, more smartphones are becoming incompatible with RearVision, making it significantly more difficult for ARP to sell its inventory. Customers have been leaving overwhelmingly negative reviews of RearVision on Amazon.com. (*Id.* ¶ 21). A majority of RearVision inventory remains unsold. (*Id.* ¶ 22).

The RearVision inventory was delivered to ARP in Massachusetts sometime in July 2017. (*Id.* ¶ 19). ARP received a few more new RearVision products than the purchase order called for, but significantly fewer returned goods. (*Id.*). Because Pearl had gone out of business, ARP contacted DSI Assignments, which refused to accept a return of the inventory. (*Id.*).

On May 29, 2018, ARP received a message from Amazon.com, its most important sales platform. The message stated that Nite Ize, Inc., had filed a complaint alleging that the RearVision magnetic mount infringed on two of its patents. (*Id.* ¶ 23). Amazon has since de-listed the individually-sold magnetic mounts from its website. (*Id.*).

**B.      Procedural Background**

DSI Assignments brought this suit on October 11, 2017. An amended complaint was filed on January 5, 2018. The amended complaint asserts 11 counts against defendants ARP,

5

Frangiosa, and Installernet, Inc.

Defendants moved to dismiss three counts in the amended complaint: (1) Count 8, a claim for violation of the Massachusetts consumer protection statute, Mass. Gen. Laws ch. 93A; (2) Count 10, a claim for *quantum meruit*; and (3) Count 11, a claim for fraud. Although the Court cautioned that the claims were "hanging by a thread," it denied the motion. (Feb. 22, 2018 Hearing Tr. at 20).

Defendants filed an answer on March 5, 2018. An amended answer was then filed on June 22, 2018, which included a counterclaim asserting four claims against DSI Assignments. Count 1 asserts a claim for breach of contract for Pearl's failure to provide the full source code for RearVision and for failing to provide ARP with the right of first refusal; Count 2 asserts a claim for breach of the warranty against infringement; Count 3 asserts a claim for violation of Mass. Gen. Laws ch. 93A; and Count 4 seeks indemnification for any damages Nite Ize may obtain against defendants for patent infringement.

DSI Assignments has moved to dismiss the counterclaim, alleging that it cannot be held liable as an assignee for Pearl's contractual obligations.

## II. Legal Standard

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . [counterclaimant] the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (*citing Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the [counterclaim] must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the [counterclaim] are true (even if doubtful in fact)."

*Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [counterdefendant] has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the [counterclaim] fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting C*entro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

### III. Analysis

The present dispute concerns only whether the assignment shields DSI Assignments from the counterclaim. The parties agree that DSI Assignments played no role in negotiating or executing the purchase order, and that California law governs the interpretation of the assignment.

As a general matter, under California law, an assignee is not personally liable for the underlying contractual obligations of the assignor to a third party. *See Sherwood Partners, Inc. v. EOP-Marina Bus. Ctr., LLC*, 153 Cal. App. 4th 977, 983 (2007). An assignee has "a duty to marshal and protect the assets" of the assignor, "which may include filing and defending lawsuits." *Id.* "To impose underlying contractual liabilities upon an assignee for the benefit of creditors because the assignee initiated litigation to protect an assignor's assets, would create a disincentive for such assignees to seek to protect an assignor's assets for the benefit of creditors." *Id.*; *see also Recorded Picture Co. v. Nelson Entm't, Inc.*, 53 Cal. App. 4th 350, 362 (1997).[3]

---

[3] DSI Assignments principally relies on *Sherwood Partners*. However, that case is inapposite. In *Sherwood Partners*, the California Court of Appeals held that the assignee could not be personally held liable for attorney's fees and costs pursuant to the underlying contract. 153 Cal. App. 4th at 983-84. By contrast, defendants here are asserting claims against DSI Assignments solely in its capacity as assignee. (Counterclaim ¶¶ 30, 35, 42, 46.

However, an assignee "stands in the shoes of the assignor, acquiring all of its rights and liabilities." *Aerofund Fin., Inc. v. Elliott*, 2001 WL 312422, at *1 (9th Cir. Mar. 30, 2001) (quoting *Prof'l Collection Consultants v. Hanada*, 53 Cal. App. 4th 1016, 1018-19 (1997)). Therefore, while an assignee is not personally liable for the assignor' liabilities, a creditor may sue the assignee to recover from the assigned assets. Indeed, as another court in this district has noted, "[i]t would be incongruous for [a] Court to entertain [an assignee's] claims against defendants . . . but not vice-versa." *Brandt v. Advanced Cell Tech., Inc.*, 349 F. Supp. 2d 54, 58 (D. Mass. 2003). Otherwise, an assignor could escape liability for any wrongdoing simply by assigning its assets to another entity.

In any event, the language of the assignment supports this conclusion. The preamble stated that the assignment was "for the benefit of creditors." (Pl. Ex. B at 1). Paragraph 5(f) stated that DSI Assignments would have all powers necessary "[t]o settle any and all claims against or in favor of [Pearl], with the full power to compromise, or, in [DSI Assignments's] sole discretion, to sue or be sued, and to prosecute or defend any claim or claims of any nature whatsoever existing in favor of [Pearl]." (*Id.* ¶ 5(f)). Therefore, the assignment envisioned that DSI Assignments would defend or settle all valid claims creditors have against Pearl, with any payments to come out of the assigned assets. Taking all well-pleaded allegations in the counterclaim as true, defendants clearly qualify as potential creditors.

## IV. Conclusion

For the foregoing reasons, the motion to dismiss is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: August 15, 2018    United States District Judge